**SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO, Appellant,**

v.

**UNITED STATES COAST GUARD, Brock Adams, as Secretary of Transportation, Admiral John B. Hayes, as Commandant of United States Coast Guard, Raymond Marshall, as Secretary of Labor, Joseph Califano, as Secretary of Health, Education and Welfare, Julius Richmond, as Surgeon General of the United States, Public Health Service, Appellees.**

No. 854, Docket 83–6262.

United States Court of Appeals, Second Circuit.

Argued Feb. 27, 1984.

Decided May 29, 1984.

---

ing 22 prayers for declaratory relief. A union of seamen aboard United States merchant vessels brought this action against the United States Coast Guard and other agencies and officials seeking declaratory relief directed to the manner in which the responsible agencies administer the laws relating to manning of vessels and working conditions on United States flag and merchant vessels, as well as to certain licensing examination procedures. The complaint is an omnibus attack on how the Coast Guard administers a rather considerable body of maritime law, and review by the courts is principally sought under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706 (1982). The United States District Court for the Eastern District of New York, Joseph M. McLaughlin, Judge, dismissed the complaint on a series of grounds, holding that the union had no standing in that there was no expression of congressional intent to allow seamen to enforce the statutes; that the doctrine of primary jurisdiction bars the court from considering the issues at this time; that the defense of sovereign immunity deprives the court of jurisdiction in this matter; and that the complaint raises issues that are not yet ripe for judicial review and should thus be dismissed for want of jurisdiction. We affirm.

Andrew Schulz, New York City (James M. Altman, Howard Schulman, Schulman & Abarbanel, New York City, of counsel), for appellant.

Charles S. Kleinberg, Asst. U.S. Atty., New York City (Raymond J. Dearie, U.S. Atty., Robert L. Begleiter, Asst. U.S. Atty., New York City, of counsel), for appellees.

William A. Carnahan (argued), Austin P. Olney, Alan Konefsky, Daniel J. Conway, Robert S. Garrick, Keith R. Anderson, Washington, D.C. (LeBoeuf, Lamb, Leiby & MacRae, Washington, D.C., of counsel), for amicus curiae American Waterways Operators, Inc.

Before OAKES, VAN GRAAFEILAND and WINTER, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from dismissal of an unwieldy 52-page, 202-paragraph complaint asserting 37 causes of action and contain-

*Facts*

Seafarers International Union of North America, AFL–CIO (Seafarers), is an international labor union with in excess of 40,-000 members who are unlicensed merchant seamen, most of whom work and sail aboard vessels (including tugs and barges) registered in the United States. This suit was brought against the Secretary of Transportation, the Coast Guard, the Commandant of the Coast Guard, the Secretary of Labor, the Secretary of Health, Education and Welfare, and the Surgeon General of the United States, seeking a declaration of rights in reference to the Coast Guard's administration of manning, licensing and working condition provisions of the relevant statutes. Seafarers seeks not only

declaratory relief but also an order compelling the defendants to enforce applicable statutes, regulations and policies, and to promulgate regulations in accordance with applicable statutes and federal policies. It is difficult to summarize the various claims made in the complaint. They can be categorized, however, by the various parts of the regulatory scheme the union claims the Coast Guard is failing to enforce.

*Manning Regulations.* The Coast Guard's enforcement of manning regulations is challenged in a variety of ways. Seafarers claims that some unspecified vessels sail without dividing their crews into three watches as required by 46 U.S.C. § 673 (1976).[1] It is further alleged that some unspecified vessels sail with seamen who have been hired to work alternately in the engine room and the deck as opposed to in one or the other, and that on some unspecified vessels officers and seamen are required to work unreasonable amounts of overtime, both also in violation of that section. Seafarers further complains that Coast Guard enforcement of 46 U.S.C. § 673 [2] is in general improperly restricted

to only those positions explicitly listed in section 673, some of which are now technologically obsolete with the advent of diesel power plants as opposed to steam engines. Seafarers alleges that section 673 should therefore be implemented in the relevant regulations to include new positions not explicitly referred to in the statute so as to effectuate Congress' intent in promulgating the statute in light of recent technological developments.[3]

The complaint further seeks to have the three watch provision of section 673 applied to persons in the position of "deck maintenance utility" because Seafarers believes persons in that position should be deemed "sailors" within 46 C.F.R. § 157.10–65, *supra* note 2. Seafarers also alleges that some unspecified tugs and barges on voyages of less than 600 miles divide their crew into less than two watches in violation of the same provisions of section 673. And another cause of action alleges that certain officers subordinate to the Coast Guard Commandant do not observe the three watch system provisions of section 673 in

1. 46 U.S.C. § 673 (1976) provided in part:

In all merchant vessels of the United States ... the licensed officers and sailors, coal passers, firemen, oilers, and water tenders shall, while at sea, be divided into at least three watches, which shall be kept on duty successively for the performance of ordinary work incident to the sailing and management of the vessel.... The seamen shall not be shipped to work alternately in the fireroom and on deck, nor shall those shipped for deck duty be required to work in the fireroom, or vice versa; nor shall any licensed officer or seaman in the deck or engine department be required to work more than eight hours in one day; but these provisions shall not limit either the authority of the master or other officer or the obedience of the seamen when in the judgment of the master or other officer the whole or any part of the crew are needed for maneuvering, shifting berth, mooring, or unmooring, the vessel or the performance of work necessary for the safety of the vessel, her passengers, crew, and cargo, or for the saving of life aboard other vessels in jeopardy, or when in port or at sea, from requiring the whole or any part of the crew to participate in the performance of fire, lifeboat, or other drills.... *Provided,* That in all tugs and barges subject to this section when engaged on a voyage of less than six hundred miles,

the licensed officers and members of crews other than coal passers, firemen, oilers, and water tenders may, while at sea, be divided into not less than two watches, but nothing in this proviso shall be construed as repealing any part of section 222 of this title.

Title 46 was recodified in 1983, Pub.L. 98–89, 97 Stat. 500 (1983), but the recodification does not apply in "proceedings that were begun," before August 26, 1983, as this one was. *See* 46 U.S. C.A. Shipping [Partial Revision] Appendix § 4(a), (b) (1983). We do not therefore refer to the recodified statutes herein.

2. The relevant regulation promulgated in accordance with § 673 is 46 C.F.R. § 157.10–65 (1983), which provides:

(a) The term "sailors" means those members of the deck department below the grade of licensed officer whose ordinary duties are incident to the mechanics of conducting the ship on her voyage, such as able seaman, ordinary seaman, quartermaster, lookout man, etc.

3. In another cause of action alleging Coast Guard failure to accommodate technological change, Seafarers asserts that the Coast Guard should require vessels to carry "wipers," a position in the past in steam engine rooms. *See* 46 U.S.C. § 672(e) (1976).

fixing complements of officers and crews for vessels subject to the manning provisions of 46 U.S.C. § 222 (1976),[4] as required by 46 C.F.R. § 157.20–5 (1983).[5]

In a further attack on the Coast Guard's manning regulations, Seafarers asserts that section 222, *supra* note 4, which requires the Coast Guard to certify that each vessel has the proper complement of officers and crew necessary for safe navigation, impliedly requires the Coast Guard to consider collective bargaining in determining vessel workforce levels. It is alleged that the relevant regulation, 46 C.F.R.

**4.** 46 U.S.C. § 222 provides in part:
No vessel of the United States subject to the provisions of title 52 of the Revised Statutes [R.S. §§ 4399–4500] or to the inspection laws of the United States shall be navigated unless she shall have in her service and on board such complement of licensed officers and crew including certificated lifeboat men, separately stated, as may in the judgment of the Coast Guard be necessary for her safe navigation. The Coast Guard shall make in the certificate of inspection of the vessel an entry of such complement of officers and crew including certificated lifeboat men, separately stated, which may be changed from time to time by indorsement on such certificate by the Coast Guard by reason of change of conditions or employment. Such entry or indorsement shall be subject to a right of appeal, under regulations to be made by the Commandant of the Coast Guard, to the Commandant of the Coast Guard, who shall have the power to revise, set aside, or affirm the said determination.

**5.** 46 C.F.R. § 157.20–5 provides in part:
(a) On vessels to which all of the provisions of section 2 of the Seamen's Act of 1915, as amended (49 Stat. 1933; 46 U.S.C. 673), apply, the licensed officers, sailors, coal passers, firemen, oilers, and water tenders shall, while at sea, be divided into at least 3 watches, the number in each watch to be as nearly equal as the division of the total number in each class will permit. The watches shall be kept on duty successively. The requirement for division into watches applies only to those classes of the crew specifically named in the aforesaid section 2 ....
(b) Officers in Charge, Marine Inspection, will note that the 3–watch system extends to all licensed officers and to the sailors, coal passers, firemen, oilers, and water tenders, and will be governed accordingly in fixing the complement of licensed officers and crew, as authorized by 46 U.S.C. 222.... 46 U.S.C. 673 does not apply to the licensed officers and crew of tugs, barges, and offshore supply ves-

§ 157.15–1 (1983),[6] does not accommodate collective bargaining in violation of the statute.

A number of the causes of action allege that the Coast Guard is allowing some vessels to avoid the manning requirements through improper classifications—by treating tug-barge combinations as a single vessel, for example.[7] Still other claims assert that the Coast Guard is allowing seamen to sail without proper certification, in violation of 46 U.S.C. § 672 (1976). More generally and finally, there are various catch-all

sels when engaged in voyages of less than 600 miles except with regard to coal passers, firemen, oilers, and water tenders. A voyage of less than 600 miles is construed as meaning the entire distance traversed in proceeding from the initial port of departure to the final port of destination, stops at intermediate ports while enroute not being considered as breaking the continuity of the voyage.

**6.** 46 C.F.R. § 157.15–1 provides:
Complement required by Certificate of Inspection.
(a) After inspecting a vessel pursuant to law and applicable regulations in this chapter, the Officer in Charge, Marine Inspection, shall specify in the Certificate of Inspection of all vessels except public nautical school ships the minimum complement of officers and crew necessary for the safe navigation of the vessels.
(b) The manning requirements for a particular vessel are determined by the Officer in Charge, Marine Inspection, after a thorough consideration of the applicable laws cited in § 157.01–10(b) and the regulations in this part together with the many factors involved, such as size, type, proposed routes of operation, cargo carried, type of business in which employed, etc.
(c) One of the criteria used for invocation of manning standards is the description of passenger vessels and public nautical school ships by relative sizes in gross tonnages....
It will be noted that these are minimum complements. Thus, at least on its face, the regulation does not affect collective bargaining for more crew members.

**7.** Such treatment is said to violate the statutorily mandated requirement of uniform regulation, 46 U.S.C. § 372 (1976), which provides:
The Commandant of the Coast Guard shall superintend the administration of the steamboat-inspection laws, and produce a correct and uniform administration of the inspection laws, rules, and regulations.

manning complaints; representative of these causes of actions is one which states that certain types of vessels which carry passengers or freight for hire, and hence are subject to the provisions of 46 U.S.C. § 404 (1976),[8] do not comply with the manning requirements of that statute, and have not been inspected by the Coast Guard as required.

*Licensing Regulations.* A number of Seafarers' causes of action allege that the Coast Guard has failed to carry out its duties under 46 U.S.C. §§ 228–229 (1976)[9] to assure that qualified persons may advance through the ranks to become deck officers and engineers. Seafarers alleges that the Coast Guard instead uses examinations which favor persons who have graduated from accredited maritime schools over the unschooled experienced applicants. In particular, the examination given for the

positions of deck officer, mate, and engineer as set forth in 46 C.F.R. §§ 10.05–45(a), 10.10–4(a), 10.15–31 (1983),[10] are challenged as too theoretical and therefore discriminatory against those Seafarers' members who have more practical work experience.

*Working Conditions.* Safety and working conditions on merchant vessels are challenged in several causes of action. Noise levels for engine machinery subject to Coast Guard inspection under 46 U.S.C. § 392 (1976) are claimed to be too high on some unspecified vessels. Other unnamed vessels are alleged to be too unhealthy to work aboard because of excessive noise levels, offensive odors and fumes, unsafe equipment and inadequate ventilation. Some unspecified vessels are said not to provide medicine chests in violation of 46 U.S.C. § 666 (1976) or adequate lifesaving

8. 46 U.S.C. § 404 pertains to ferryboats, canal boats or "other small craft of like character" carrying passengers or freight for hire and inspection, crew and other requirements in respect thereto.

9. 46 U.S.C. § 228 provides:
 Whenever any person applies for authority to be employed as chief mate of ocean or coastwise steam vessels or of sail vessels of over seven hundred tons, or as second or third mate of ocean or coastwise steam vessels, who shall have charge of a watch, or whenever any person applies for authority to be employed as mate of river steamers, the Coast Guard shall require satisfactory evidence of the knowledge, experience, and skill of the applicant in lading cargo and in handling and stowage of freight, and if for license as chief mate on ocean or coastwise steamers, or of sail vessels of over seven hundred tons, or as second or third mate of ocean or coastwise steamers, who shall have · charge of a watch, shall also examine him as to his knowledge and ability in navigation and managing such vessels and all other duties pertaining to his station, and if satisfied of his qualifications and good character it shall grant him a license authorizing him to perform such duties for the term of five years upon the waters upon which he is found qualified to act . . . .
 Section 229 provides:
 Whenever any person applies for authority to perform the duties of engineer of any steam vessel, the Coast Guard shall examine the applicant as to his knowledge of steam

machinery, and his experience as an engineer, and also the proofs which he produces in support of his claim; and if, upon full consideration, it is satisfied that his character, habits of life, knowledge, and experience in the duties of an engineer are all such as to authorize the belief that he is a suitable and safe person to be intrusted with the powers and duties of such a station, it shall grant him a license, authorizing him to be employed in such duties for the term of five years, in which it shall assign him to the appropriate class of engineers . . . .

10. For example, 46 C.F.R. § 10.15–31(c) prescribes for the examination for a mate's certificate:
 (c) *Mate.* Candidates for license as mate will be required to understand and give satisfactory explanations of:
 (1) Navigation . . . .
 (2) Rudimentary seamanship. . . .
 . . . .
 (3) The Rules to Prevent Collisions of Vessels including both the International Rules and the Pilot Rules for Inland Waters. . . .
 (4) Distress signals and use of line-throwing apparatus.
 (5) Buoyage system and aids to navigation.
 (6) Precautions to be taken against fire, explosions from oil or gas, and spontaneous combustion. . . .
 (7) Candidates for a sailing ship license will also be asked questions on the taking in and setting of fore and aft sail, and applicable questions relating to the handling of a sail vessel.
 (8) Pollution abatement.

apparatus in violation of 46 U.S.C. § 481 (1976). It is also claimed that certain unnamed vessels are permitted to operate in violation of 46 U.S.C. § 660a (1976), and 46 C.F.R. § 32.40–5 (1983), which regulate health, lighting, ventilation and sanitary conditions on board certain vessels.

■ It will thus be seen that the complaint alleges that there were unspecified instances of statutory violations on board "some" unnamed vessels or "some or all" unnamed vessels subject to Coast Guard regulation. The complaint then asserts that Seafarers had somehow requested the Coast Guard to enforce the law according to its statutory interpretations, but that the Coast Guard has neglected to do so either by failing to enforce statutes or regulations or by failing to promulgate rules to enforce statutes.

For some causes of action exhaustion of administrative remedies is pleaded in the most general of terms, by stating, for example, that "[p]laintiff has requested the Commandant and the Coast Guard to enforce the provisions ... but the defendants have failed to do so." For other causes of action exhaustion is not pleaded at all. Apparently neither Seafarers nor any of its members have made use of enforcement actions provided under the Coast Guard regulations, discussed *infra*, to challenge specific violations on specific vessels. Instead appellants have allegedly notified the Coast Guard of various general patterns of nonenforcement of the various regulations.

Neither does the complaint set forth facts referring to consistent practices, policies or rules on the part of the Coast Guard which allegedly violate the relevant laws or regulations. *See infra* note 13. Rather the complaint simply alleges that the Coast Guard failed to enforce the statutes and regulations on some or all unspecified vessels, or failed to promulgate regulations pursuant to its statutory authority which has resulted in statutory violations occurring on some or all vessels within its jurisdiction. An omnibus complaint in this form fails to state a justiciable claim for the reasons demonstrated below.

*The Decision Below*

■ The district court dismissed the complaint on a number of independent grounds, not all of which we can agree with. The district court first held that Seafarers lacked standing to bring this suit to enforce the maritime statute. We do not read the complaint as seeking to enforce the maritime laws directly against individual vessel owners and operators; none are named and while the complaint contains myriad allegations that laws are not being enforced or are being enforced unequally, the complaint is directed at the Coast Guard and other federal agencies themselves. Thus, we do not agree with the district court that it is relevant to consider whether Congress has provided Seafarers with a private right of action to enforce maritime statutes. This is not a case like, *e.g., Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), where plaintiffs sought to enforce laws directly against members of a regulated class, thereby bypassing the agency's enforcement authority. Rather, it is a suit directly against the agency, though what it is seeking is statutory enforcement. The claim is made primarily under section 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702, and Seafarers seeks judicial review of agency inaction. *See* Note, *Judicial Review of Administrative Inaction,* 83 Colum.L.Rev. 627, 638 n. 79, 645 (1983); Stewart & Sunstein, *Public Programs and Private Rights,* 95 Harv.L.Rev. 1195, 1267–89 (1982). Here, as in *CETA Workers' Organizing Committee v. City of New York,* 617 F.2d 926, 934–36 (2d Cir.1980), with respect to the claim that the federal agency there failed to enforce federal law, we do not use implied private right of action analysis. The APA explicitly creates a cause of action for "persons" (including unions, *see* 5 U.S.C. § 551(2) (1982)) aggrieved by agency action. 5 U.S.C. § 702.

*Ripeness*

■ The district court was on firmer ground in its determination that the case

was not ripe. As *Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), holds, the ripeness doctrine is designed

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*See also Aquavella v. Richardson,* 437 F.2d 397, 403–05 (2d Cir.1971). The law of ripeness is now very much a matter of common sense, *Continental Air Lines, Inc. v. Civil Aeronautics Board,* 522 F.2d 107, 124 (D.C.Cir.1975), whether one speaks in the related terms of "ripeness," of satisfying the "final agency action" requirement of the APA (*see* 5 U.S.C. § 704; *Aquavella,* 437 F.2d at 403), or of the exhaustion requirement implicit in the APA (*see* 5 U.S.C. § 702(1); *In re Restland Memorial Park,* 540 F.2d 626, 628 (3d Cir. 1976)). What these doctrines require, however they may be put, is a determination that there is a justiciable case or controversy within the prudential rules by which we are governed. *Cf. Warth v. Seldin,* 422 U.S. 490, 498–99 & n. 10, 95 S.Ct. 2197, 2204–05 & n. 10, 45 L.Ed.2d 343 (1975) (standing as element of justiciability under

Article III "bears close affinity to questions of ripeness ... and of mootness ...").

Ripeness in particular requires a two-fold inquiry evaluating the hardship to the parties of withholding judicial determination and evaluating whether the issues are fit for judicial determination. *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515. Resolution of this latter question requires consideration of a variety of pragmatic factors: whether the agency's actions or inactions challenged in the law suit are "final," *id.* at 149–51, 87 S.Ct. at 1515–16, whether the issues presented for review are primarily legal as opposed to factual in nature, *id.* at 149, 87 S.Ct. at 1515, and whether administrative remedies have been exhausted at least to the extent that an adequate factual record has been established.[11] *See generally Aquavella,* 437 F.2d at 403–05; *see also Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947).

In terms first of determining whether the Coast Guard's actions are final, our inquiry concerns "whether the process of administrative decision-making has reached a stage where judicial review will not be disruptive of the agency process and whether legal consequences will flow from the action taken ...." *National Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission,* 539 F.2d 824, 836–37 (2d Cir.1976), *vacated and remanded for consideration of mootness,* 434 U.S. 1030, 98 S.Ct. 759, 54 L.Ed.2d 777 (1978). Here, it is not rules for enforcing the maritime laws which are challenged, as Seafarers would have it,[12]

---

**11.** Technically, "ripeness" and "exhaustion" are different if to some extent overlapping grounds for dismissal, ripeness focusing on the types of functions that courts should perform, exhaustion on how far a party must pursue administrative remedies before going to court. 4 K. Davis, *Administrative Law Treatise* § 25:1, at 350 (2d ed. 1983). In this case, portions if not all of the complaint could probably properly be dismissed on either ripeness or exhaustion grounds. Exhaustion analysis is relevant to our holding on justiciability because Seafarers' failure to exhaust or even engage in administrative review has left the factual record so undeveloped that the case is not ripe for judicial review, and

because it is relevant to a weighing of the unfairness to the parties of withholding judicial determination.

**12.** Seafarers in its brief on appeal argues that its complaint challenges Coast Guard "policies and consistent practices" interpreting maritime laws and the Coast Guard's obligation to enforce those laws. The argument is made that each of these policies and practices constitutes reviewable "agency action" within the meaning of 5 U.S.C. §§ 551(13) and 701(b)(2) (1982). *See also Adams v. Richardson,* 480 F.2d 1159, 1161–62 (D.C.Cir.1973) (en banc); *Carey v. Klutznick,* 508 F.Supp. 404, 412 (S.D.N.Y.), *aff'd,* 637 F.2d

but rather inaction in enforcing certain maritime laws on "some vessels" that is alleged in the complaint. It is not alleged that the pleaded instances of alleged Coast Guard nonenforcement themselves constitute or result from Coast Guard rules or policies which could be reviewed. As a result, the pleaded Coast Guard inaction simply does not constitute final agency action. The Coast Guard has not announced any rule nor does the complaint allege that any rules have been put into effect with legal consequences flowing from them. Thus, this is not a case like *Aquavella*, 437 F.2d at 404–05, where an agency took preliminary action some eighteen months prior to court consideration and it was held to be final action even though there was no further formal action by the agency.

■ Nor can we say that the issues presented for review are primarily legal as opposed to factual in nature. Pleading a very large number of discrete factual claims does not in itself make the complaint taken as a whole one that raises a legal question.[13] The whole here does not amount to more than the sum of its parts. Nor does the vagueness with which the factual allegations are pleaded make this complaint legal in nature. As we have said, it simply helps render the claims addressed in the complaint nonjusticiable.

■ The question of noise aboard ships, to pick one example, whether discussed in terms of policy or of individual cases, involves complex facts about noise engineering, maritime technology and ship procedures. Similarly, the question of engineroom manning inevitably involves technical questions regarding machinery aboard particular vessels. Likewise, the question of who is qualified for a particular officer's license, a question which is largely committed to Coast Guard discretion in any event, *Soderback v. Siler*, 610 F.2d 643, 646 (9th Cir.1979), involves myriad facts concerning the marine industry. Thus, any adjudicable dispute with respect to these questions must arise in a specific factual record developed by the agency which, unlike the court, has both the expertise and the ability to do so.

■ While Seafarers alleged broadly in its complaint that it exhausted all reasonable administrative remedies, the district court quite properly went behind that allegation and concluded that the union had not done so. It is only "final agency action for which there is no other adequate remedy in a court" which is subject to judicial review under the APA. 5 U.S.C. § 704; *see CETA Workers' Organizing Committee v. City of New York*, 617 F.2d at 935. Whether or not exhaustion of administrative remedies is required in all instances under this section, Seafarers' failure to exhaust here leaves the complaint in a state not ripe for judicial determination for two reasons. First, as we have indicated, there

---

834 (2d Cir.1980). However the complaint simply does not plead the existence of such rules. For example, one such rule is said in the brief on appeal to be "the crewmember accommodations" rule—a rule which is said to be "a rule permitting inspection of crewmember accommodations on vessels less frequently than once a month." We are cited to the twenty-seventh cause of action and ¶¶ 152–55 of the complaint. But examination of that portion of the complaint makes no reference whatsoever to the "crewmember accommodations" rule or to anything other than the Coast Guard's failure to perform inspections as required by 46 U.S.C. § 660a(a).

So too, with the brief's other "rules"—the "reduction-in-crew" rule, "integrated tug/barge systems" rule, the "riding crews" rule, the "automated equipment" rule, the "general purpose crew" rule, the "overtime" rule, and the "three

watch" rule, as well as the "anti-practical experience" rule said to be applied to licensing examinations. The complaint mentions no such rules, but simply refers to isolated violations of the statutes in respect to "some vessels." Given that the complaint does not describe the actions or practices that are bases for the "rules" which appellant challenges in its brief on appeal, it does not put the defendants on notice as to the action or practice that is being challenged, does not crystallize a sufficiently concrete case or controversy for the district court or this court to review, and does not refer to any final agency action.

**13.** For a revealing discussion of the fact/law dichotomy and its ramifications, *see Antilles Steamship Co., Ltd. v. Members of the American Hull Insurance Syndicate*, 733 F.2d 195 at 202 (2d Cir.1984) (Newman, J., concurring).

is simply no administrative record developed which the district court can review, *Rescue Army*, 331 U.S. at 575–85, 67 S.Ct. at 1423–27. Second, in weighing the hardship to the parties of withholding court consideration, *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515, the fact that there are available administrative remedies which are not even referred to, much less shown to have been exhausted, is also crucial.

 Seafarers is not put to any particular hardship by the district court's dismissal of its complaint. If it wishes to challenge instances of nonenforcement, or to demonstrate a pattern of nonenforcement, it may do so in a number of ways under existing Coast Guard regulations. For example, any person may report an apparent violation of any law, regulation, or order that is enforced by the Coast Guard to any Coast Guard facility. 33 C.F.R. § 1.07–10(a) (1983). If the district commander determines that a prima facie case exists, the complaint is forwarded to a hearing officer with a recommended action. 33 C.F.R. § 1.07–10(b) (1983). That action becomes final unless appealed in a timely fashion. 33 C.F.R. § 1.07–70 (1983). In terms of inspection of vessels, the Officer in Charge, Marine Inspection (OCMI), is responsible for inspecting vessels to insure that they comply with safety, equipment, manning and operation laws, rules and regulations as specified in 46 C.F.R. § 1.05(b). Persons aggrieved by OCMI's action or inaction may appeal first to the local district commander and then to the commandant, 46 C.F.R. § 2.01–70 (1983). *See also* 46 U.S.C. § 653 (1976) (procedure for reporting safety deficiencies).

As for manning requirements, whenever persons directly interested in or affected by any decision or action of the OCMI feel aggrieved, they may appeal first to the local district commander and then to the commandant, 46 C.F.R. § 157.15–10 (1983). *See also* 46 U.S.C. § 673 (1976) (remedy for manning deficiencies). As for examinations for licenses, special procedures exist whereby an applicant may after one year insist upon taking the examination from a different OCMI. 46 C.F.R. § 10.02–19 (1983). Moreover an applicant denied a license must be furnished a statement of reasons. 46 C.F.R. § 10.02–19(c). And any person affected by an OCMI action including examination decisions may take appeals first to the district commander and then to the commandant. 46 C.F.R. § 10.02–33 (1983).

In no place does the complaint allege utilization, much less exhaustion, of any of these procedures. Rather, as we have indicated, it asserts unspecified instances whereby Seafarers has requested the Coast Guard to enforce the law, and then states the bare legal conclusion that it has exhausted its administrative remedies. It has not, however, pursued a test case or apparently brought any case at all, using any of the above described procedures to demonstrate particular abuses alleged with respect to manning, safety or licensing provisions. Instead Seafarers seeks an abstract interpretation of the entire regulatory scheme. Were the relief sought by the complaint to be granted, it would require the federal courts in the future to supervise the Coast Guard's handling of virtually every alleged violation of these provisions. The very concern expressed by *Abbott Laboratories*, 387 U.S. at 148–49, 87 S.Ct. at 1515, as to the courts' "entangling themselves in abstract disagreements over administrative policies" and the concern to "protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties" is implicated by this case. The union simply has not even begun to make use of available means of administrative redress.

Finally, as to the hardship to the parties of withholding court consideration, *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515, the Coast Guard would be much more severely burdened by a decision to accept jurisdiction than Seafarers is by the district court's decision to dismiss the complaint. As we have just stated, Seafarers has administrative and other remedies available

to it. Conversely, were the district court to become involved in the merits of this case, it would essentially act as supervisor of the entire regulatory scheme, sitting over the Coast Guard's enforcement activities. Here, as in *Council of and for the Blind of Delaware County Valley, Inc. v. Regan*, 709 F.2d 1521, 1533 (D.C.Cir.1983) (en banc), plaintiffs seek "the broadest possible continuing supervision of an Executive agency by a court." Had the district court become more involved with the case, it necessarily would have at least disrupted the orderly operation of maritime regulation, if not flaunted the structural limitations of the Constitution. *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 2788, 77 L.Ed.2d 317 (Powell, J., concurring) (1983); *see also* 1 K. Davis, *Administrative Law Treatise* § 2:6, at 78–82 (2d ed. 1978).

Moreover, we are advised that the Coast Guard is itself engaged in reexamination of some of the very regulations involved here. For example, it has issued an extensive Navigation and Vessel Inspection Circular on the question of noise pollution. Moreover, it has instituted a comprehensive rulemaking on licensing and examination. 48 Fed.Reg. 35,920 (Aug. 8, 1983). For a court to interfere in this ongoing administrative process on the basis of abstract and broad allegations such as these would be most unwise. We decline to do so. *See* Stewart & Sunstein, *Public Programs and Private Rights*, 95 Harv.L.Rev. at 1269–70.

This is not to say that a properly pleaded complaint based on some of the same factual allegations raised here would not be cognizable by a federal court if the issues were otherwise ripe for judicial review. There is a strong presumption that an agency's exercise of its enforcement discretion is reviewable. *Aquavella*, 437 F.2d at 400–01. *See also* 2 K. Davis, *Administrative Law Treatise* § 9:6, at 239–40 (2d ed. 1979). The question of the reviewability of agency enforcement discretion turns on pragmatic considerations particular to each factual setting as to whether there is law to apply and whether the re-

view required would unnecessarily impede the agency as well as consideration of whether Congress intended to preclude review. *See Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975). *See also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). But because we conclude that the issues raised are in such a vague and abstract frame of reference so as at this time to be not fit for judicial decision, and because a balancing of the hardship to both parties in this instance weighs heavily in favor of a court's not interfering with the Coast Guard's enforcement discretion and rulemaking power, we agree with the district court that the case should be dismissed as not suitable for judicial resolution.

Judgment affirmed.